**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY L. PRATT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 12 C 8983** |
| **v.** | ) | |
| | ) | **Magistrate Judge Daniel G. Martin** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Mary L. Pratt (Pratt) seeks judicial review of a final decision of the Acting Commissioner of Social Security (Commissioner) denying her application for supplemental security income (SSI). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Because the administrative law judge's decision is not supported by substantial evidence, the denial of benefits is reversed and this case is remanded for further proceedings consistent with this opinion.

**I. BACKGROUND**

Pratt applied for SSI on December 17, 2009, alleging she became totally disabled on December 1, 2007 because of asthma, arthritis in both knees, obesity, depression, and anemia (R. 169-71). She later amended her onset date to December 17, 2009. (R. 47). Pratt was born on July 31, 1967 and suffers from arthritis, back pain, asthma, hypertension, and morbid obesity. (R. 49). Pratt completed high school. (R. 49, 181). Pratt does not drive and has past work experience as a bagger at a grocery store, cashier, and babysitter. (R. 49, 50-52). Pratt last worked in 2009 as an after-school babysitter. (R. 52). Pratt's SSI application was denied at the initial and reconsideration levels. (R. 97-103, 107-110, 515-22, 530-40).

### A.     Medical Evidence

Dr. Harvey I. Friedson, Psy.D., evaluated Pratt on April 3, 2010 for approximately one hour. (R. 436-40). Pratt presented as "very cooperative" and alert with "somewhat of a sad quality." (R. 436, 438). As to Pratt's mood and affect, Dr. Friedson noted that "there was some range of affect, though she does appear depressed." (R. 438). Pratt's speech was relevant and coherent. Id. Dr. Friedson found no evidence of psychotic or schizophrenic process. Id. Dr. Friedson noted that Pratt was "quite heavy" and her breathing "may be somewhat labored." (R. 439). Dr. Friedson found that Pratt has "somewhat of a sad, subdued quality." Id. He diagnosed Pratt with depressive disorder. (R. 440).

On April 3, 2010 Pratt underwent a consultative examination with Norbert De Biase, M.D. (R. 490-99). Dr. De Biase reviewed the medical information sent by the Bureau of Disability Determination Services and spent thirty-five minutes with Pratt obtaining her history and performing the consultative examination. (R. 490). Pratt reported having daily pain in her back and knees "for a short time." Id. Pratt also complained of daily pain in her shoulders. Id. Pratt described the pain in her back as radiating down both legs and being worse in the morning. Id. She stated the pain in her joints is throbbing in nature. Id. Pratt also stated that she could sit for an hour and stand for a half an hour. Id. Pratt's pain is alleviated when she lays down and is worse with movement. Id. at 490-91. On physical examination, Pratt weighed 373.4 lbs. (R. 491). Her respiratory rate was 18 and unlabored. Id. Dr. De Biase found Pratt to be awake, alert, oriented, no acute distress, obese, and a fair to good historian. Id. Dr. De Biase noted that Pratt was able to walk 50 feet without the use of an assistive device, but that her gait was abnormal with wobbling. (R. 492, 495). Dr. De Biase wrote that Pratt had mild difficulty performing toe, heel, squat and tandem gait, and getting on and off the examination table. (R. 492). Straight leg raising was negative. (R. 492, 495).

Dr. De Biase found tenderness in both shoulders, both knees, and lower back, but Pratt's range of motion was free, full, and painless in all joints except for the lumbosacral spine, both hips and both knees. (R. 492). Pratt had a reduced range of motion in her lumbar spine–flexion to 50/90 degrees and extension/left and right lateral bending to 15/25 degrees. (R. 497). Pratt also had a reduced range of motion in her hips, exhibiting flexion of 80/100 degrees, extension of 10/30 degrees, abduction of 30/40 degrees, and adduction of 10/20 degrees. (R. 498). Dr. De Biase noted knee flexion of 100/150 degrees. Id. On neurologic examination, Dr. De Biase found Pratt's strength, sensation and deep tendon reflexes were symmetric and within normal limits throughout. Id. Pratt's motor strength was 5/5 throughout and cerebellar testing was negative. Id. Dr. De Biase diagnosed back pain, arthritis, asthma, depression, anemia, and morbid obesity. (R. 493).

A lumbar spine x-ray taken on April 3, 2010 revealed "mild degenerative arthritic change" with "bony hypertrophy noted along the iliac crests." (R. 489). An x-ray of Pratt's left knee on the same day revealed mild degenerative changes. (R. 500). On April 16, 2010, Pratt underwent a spirometry test, which is used to assess lung function. The spirometer results showed premed testing of a "moderate restriction" and postmed testing of a "mild restriction." (R. 485).

On April 12, 2010, Pratt saw Dr. Chukwudozie Ezeokoli in connection with a follow-up for an overnight hospital admission due to a food allergic reaction on March 27, 2010. (R. 546-58, 567-80). Under the heading "Problem List," Dr. Ezeokoli listed allergic reaction to food, asthma, hypertension, osteoarthritis in knees, and overweight. (R. 546). Dr. Ezeokoli noted that Pratt's chest was clear and she was not wheezing. Id. Pratt weighed 377 pounds. Id. Dr. Ezeokoli advised Pratt to lose weight and recommended a bariatric procedure. (R. 547). Dr. Ezeokoli recommended that Pratt continue using her asthma and hypertension medications and carry around an EpiPen and Benadryl for her allergies. Id.

On April 27, 2010, Lionel Hudspeth, Psy.D., prepared a Psychiatric Review Technique. Dr. Hudspeth diagnosed Pratt with a depressive disorder but found that her impairments were "not

severe." (R. 501, 504). Dr. Hudspeth concluded that Pratt had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 511). Dr. Hudspeth found Pratt's allegations about her symptoms "partially credible" given her history. (R. 513).

On April 28, 2010, Dr. James Madison, a non-examining state agency physician, reviewed Pratt's medical records and assessed her RFC. (R. 515-22). Dr. Madison concluded that Pratt could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (R. 516). He also found that Pratt could sit, stand, or walk for about six hours in an eight-hour workday and push or pull for an unlimited period. Id. Dr. Madison noted that Pratt should only occasionally balance and should avoid concentrated exposure to extreme cold and pulmonary irritants. (R. 517, 519). Dr. Madison found that Pratt showed no manipulative, visual, or communicative limitations. (R. 518-19). Dr. Madison determined that Pratt's statements regarding her symptoms appeared to be "partially credible." (R. 522).

On August 30, 2010, Dr. Marion Panepinto, another non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment of Pratt and found more significant limitations. (R. 530-37). In his assessment, Dr. Panepinto concluded that Pratt could occasionally lift 10 pounds; frequently lift less than 10 pounds; stand or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had an unlimited ability to push and pull. (R. 531). Dr. Panepinto found that Pratt could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (R. 532). Dr. Panepinto determined that Pratt should never climb ladders, ropes, or scaffolds. Id. Dr. Panepinto identified no manipulative, visual, or communicative limitations for Pratt. (R. 533-34). Dr. Panepinto noted that Pratt should avoid concentrated exposure to extreme cold, pulmonary irritants, and hazzards like machinery or heights. (R. 534). Dr. Panepinto found Pratt's allegations concerning her symptoms to be "partially credible" in light of her history of degenerative joint disease of the knees and degenerative disc disease of the

lumbar spine as well as asthma but concluded that her allegations were "not to the severity alleged." (R. 537).

At a follow-up appointment with Dr. Ezeokoli on September 15, 2010, Pratt complained of pain in her knees and hips. (R. 549). Dr. Ezeokoli noted that x-rays of her knees showed arthritis. Id. Dr. Ezeokoli wrote that a musculoskeletal examination was normal. Id. Dr. Ezeokoli further noted that Pratt weighed 372 pounds and was not wheezing. Id. Dr. Ezeokoli again advised Pratt to lose weight and to return to the clinic in three months. (R. 550). Dr. Ezeokoli recommended that Pratt continue with the same regime of medications. Id

On September 28, 2010, Dr. Ezeokoli completed a Physical Residual Functional Capacity Questionnaire for Pratt. (R. 541-45). Dr. Ezeokoli noted that Pratt has been diagnosed with asthma, osteoarthritis of both knees, high blood pressure, and as overweight and her conditions are chronic. (R. 541). Dr. Ezeokoli reported that Pratt suffers from the following symptoms: shortness of breath on exertion, bilateral knee pain with walking, wheezing, and facial swelling. Id. He described Pratt as having limited ambulation with sharp, constant pain in both knees at a 7-9 out of 10, not relieved by pain medications. Id. Dr. Ezeokoli noted clinical findings of shortness of breath, knee swelling and tenderness, and wheezing. Id. He reported that Pratt was not a malingerer and found that her impairments were reasonably consistent with the symptoms and functional limitations he described. (R. 542).

Dr. Ezeokoli concluded that Pratt was incapable of even "low stress" jobs given her constant pain. Id. Dr. Ezeokoli opined that Pratt could walk 1 to 2 city blocks without rest or severe pain, sit 45 minutes at a time, stand 20 minutes at a time, stand or walk less than 2 hours in an eight-hour workday, and sit about 2 hours in an eight-hour workday. (R. 542-43). Dr. Ezeokoli concluded that Pratt would need to take unscheduled breaks every 20 to 45 minutes during an eight hour workday and the breaks would need to be 15-20 minutes long. (R. 543). He reported that Pratt could occasionally lift less than 10 pounds and rarely lift 10 pounds. Id. Dr. Ezeokoli

found that Pratt should rarely twist, stoop (bend), or climb stairs and never crouch/squat or climb ladders. (R. 544). Dr. Ezeokoli concluded that Pratt would likely miss work about four days a month because her impairments produced "good days and bad days." Id.

On June 29, 2011, Pratt went to Provident Hospital's emergency room complaining of knee pain, mostly in her joints for two months, which was exacerbated by movement and weight-bearing walking and relieved by rest. (R. 635). Pratt rated her pain as 8 on a 10-point scale upon activity. (R. 649, 659). Pratt reported that she received no relief from non-steroidal anti-inflammatory drugs. (R. 635). An x-ray taken of Pratt's knees that same day showed joint space narrowing of the left knee. (R. 644-45). The emergency room physician diagnosed degenerative joint disease of the knees with osteophytes noted on the x-ray. (R. 637). The physician prescribed naproxen[1] and ketorolac[2] for the pain. (R. 638, 639). Pratt was directed to follow-up with the orthopedic clinic within 1 to 2 days. (R. 638).

On July 20, 2011, Pratt had another follow-up appointment with Dr. Ezeokoli. (R. 660-62). Dr. Ezeokoli noted that Pratt was recently seen in the emergency room for knee pain. Dr. Ezeokoli also noted that Pratt had gained 30 pounds since her last visit and weighed 402 pounds. (R. 661). Dr. Ezeolkoli indicated that x-rays of Pratt's knees showed osteoarthritis of the knees bilaterally. Id. He recommended that Pratt follow-up with the orthopedic clinic and that she would likely need steroid injections. (R. 662). Dr. Ezeolkoli further recommended that Pratt continue with the same regime of medication and he refilled Pratt's hypertension medication. (R. 661-62).

---

[1] Naproxen is a non-steroidal anti-inflammatory drug used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html.

[2] Ketorolac is a non-steroidal anti-inflammatory drug used for the short-term relief of moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001/html.

## B.     Plaintiff's Testimony

At the administrative hearing before the ALJ on July 12, 2011, Pratt described the pain in her knees as feeling "like a drill" is in her knees.  (R. 54).  Pratt also testified that her feet and ankles have been swelling for the last two years.  (R. 64).  Pratt testified that her treating physician recommended lap band surgery for her obesity.  (R. 66-67, 79).  Pratt takes ibuprofen and naproxen for the osteoarthritis in her knees.  (R. 69).  Pratt stated she takes two pills every six hours for pain, even though her prescription is for one pill every six hours.  Id.  Pratt rated her knee pain as eight out of ten without pain medication and four out of ten on her pain medication.  (R. 70).  Pratt testified that her pain medication makes her stomach feel upset.  (R. 54).  Pratt stated that she had an appointment with an orthopedist two days after the hearing.  (R. 82).

Pratt testified that she also suffers from hypertension and asthma.  (R. 72-73).  Pratt uses an inhaler, a nebulizer, and medication to treat her asthma.  (R. 73).  Pratt visited the emergency room twice last year due to asthma.  (R. 74).  Pratt has food and laundry detergent allergies.  (R. 75-76).  She was advised to use Benadryl or an EpiPen if there are signs of an allergic reaction. (R. 75-76).  Pratt uses the Benadryl about twice a week which makes her drowsy.  (R. 84).  Pratt reported that she became depressed and gained significant weight when her mother died in May 2003.  (R. 77).  Pratt explained that she lost all of her hair as a result of stress.  (R. 83).

In term of her physical abilities, Pratt testified that she can walk for 30 minutes to an hour but she would be out of breath and have lower back pain.  (R. 59).  Pratt thought she could stand for an hour or two before having to sit.  (R. 60).  Pratt testified that she can sit for two hours at a time.  Id.  Pratt can lift a gallon of milk or eight pounds.  Id.  Pratt's daily activities are very limited. Pratt testified that on a typical day, she lays in bed all day because she feels tired.  (R. 54-56). Pratt prepares meals in the microwave, reads books, and watches television.  (R. 57, 59).  Pratt explained that her sister Tracy Pratt does the grocery shopping, cleaning, washing dishes, cooking and laundry for her.  (R. 59, 61, 85).  Pratt's sister visits her every day.  (R. 85).

### C.    Tracy L. Pratt's Statements

Pratt's sister, Tracy Pratt, was not present at the hearing, but she provided two statements describing how Pratt's condition limits her daily activities.  (R. 223-30, 272-73).  On January 25, 2010, Tracy Pratt completed a third-party questionnaire, in which she stated that Pratt was able to prepare frozen meals in the microwave for herself.  (R. 225).  However, Pratt is unable to do any cleaning, laundry, ironing, or other chores.  Id.  Tracy Pratt assists Pratt with getting out of bed, getting in and out of the bathtub, putting on her socks and pants, cooking, and household chores.  (R. 223-25).  Tracy Pratt noted that Pratt is able to walk slowly about one block before needing to rest.  (R. 227).  Tracy Pratt also indicated that generally Pratt "doesn't go anywhere because of her conditions, just basically to the doctor's office."  (R. 226).  Tracy Pratt also provided a letter dated July 11, 2011 confirming that she shops, washes clothes, picks up prescriptions, cooks, and does housekeeping for her sister.  (R. 273).

### D.    Vocational Expert's Testimony

Richard Hamersma testified at the hearing as a vocational expert ("VE").  (R. 88).  He identified Pratt's past relevant work as a bagger at a grocery store and a childcare worker.  (R. 89-90).  The ALJ presented a hypothetical of an individual of Pratt's age, education, and work experience who could lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand and walk two hours in an eight hour workday, sit six hours with normal rest periods with an inability to work at heights, climb ladders, or frequently negotiate stairs, only occasionally balance, stoop, crouch, kneel, or crawl, avoid concentrated exposure to fumes, dust, odors, gases, or poorly ventilated areas, avoid operation of moving or dangerous machinery, unable to understand, remember, and carry out detailed and complex job instructions, unable to perform work that requires intense focus and concentration for extended periods, and would be expected to be off task about five percent of the time in an eight-hour workday.  (R. 91).  The VE testified that such an individual would be unable to perform Pratt's past relevant work.  Id.  The VE further testified

that such individual would be able to perform other sedentary jobs, such as cashier (4,000 positions in the Chicago metropolitan area), inspector (1,000 jobs), and hand packager (1,000 jobs). (R. 91-92). The ALJ then asked the VE how the treating physician's RFC would impact the performance of these jobs. The VE testified that all competitive work would be precluded with these additional restrictions. (R. 93).

Next, Pratt's attorney asked the VE if the individual described in the first hypothetical could still perform the jobs identified if the time off task percent was fifteen percent instead of five percent. (R. 93). The VE testified that off task tolerance is usually 10 to 12 percent and the jobs identified could not be performed if off task fifteen percent of the time. (R. 93-94). Pratt's attorney then asked the VE if the individual described in the first hypothetical could perform the identified jobs if an additional restriction of missing work two or three days per month was added. (R. 94). The VE testified that two days a month is the maximum a person is usually allowed to miss and three days per month would eliminate all jobs. Id. Pratt's attorney asked if the cashier job would be eliminated if the person was consistently making mistakes, and the VE responded that consistent mistakes as a cashier would not be tolerated. (R. 95).

### E. ALJ's Decision

Under the required five-step analysis used to evaluate disability, ALJ Jose Anglada found that Pratt had not engaged in substantial gainful activity since her application date of December 17, 2009 (step one); her obesity, arthritis, and asthma were severe impairments (step two); but they did not qualify as a listed impairment (step three). (R. 14-17). The ALJ determined that Pratt retained the residual functional capacity (RFC) to perform a range of sedentary work, i.e., lift/carry less than ten pounds frequently and ten pounds occasionally; stand/walk two out of eight hours and sit six out of eight hours with normal rest periods; no work at heights, climbing ladders, or frequently negotiating stairs; only occasional balancing, stooping, crouching, kneeling, or crawling; avoid concentrated exposures to fumes, dust, odors, gases or poorly ventilated areas; avoid operation

of moving or dangerous machinery; unable to understand, remember, and carry-out detailed and complex job instructions; not suited for work that requires intense focus and concentration for extended periods; and would be expected to be off task five percent of the time in an eight-hour workday.  (R. 17-18).  Given this RFC, the ALJ concluded that Pratt was unable able to perform her past relevant work as a customer service representative, babysitter, and bagger at a grocery store (step four).  (R. 21).  At step five, the ALJ determined that there were jobs that exist in significant numbers in the economy that Pratt could perform considering her age, education, and residual functional capacity, such as cashier, inspector, and hand packager.  (R. 21-22).  The Appeals Council denied Pratt's request for review on September 27, 2012.  (R. 1-6).  Pratt now seeks judicial review of the final decision of the Commissioner, which is the ALJ's ruling. O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010).

## II.  DISCUSSION

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a).  In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step sequential inquiry:  (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience.  20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000).  "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not

disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence, based upon a legal error, or too poorly articulated to permit meaningful review. Hopgood ex rel. v. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In its substantial evidence review, the court critically reviews the entire administrative record but does not reweigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its own judgment for that of the Commissioner. Clifford, 227 F.3d at 869. An ALJ's credibility determination is generally entitled to deference and will not be overturned unless it is patently wrong. Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010).

The ALJ denied Pratt's claim at step five, finding that Pratt retained the RFC to perform a range of sedentary work. Pratt challenges the ALJ's adverse credibility finding, failure to give controlling weight to her treating physician's opinions, and failure to account for her obesity.[3] For

---

[3] Pratt also challenges the ALJ's failure to conclude that her depression was a severe impairment. (Doc. 20 at 14). At step two, the ALJ determines whether the claimant has a "severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe . . . ." 20 C.F.R. § 416.920(a)(4)(ii). Step two is a threshold step and "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluative process." Castile v. Astrue, 617 F.3d 923, 926-27 (7th Cir. 2010). The ALJ here determined that Pratt's depression was not severe because it causes no more than mild limitations in the first three functional areas of the paragraph B criteria and she experienced no episodes of decompensation. (R. 15). The ALJ found Pratt's obesity, arthritis, and asthma were severe impairments and proceeded to the remaining steps of the five-step sequential. Therefore, the ALJ's failure to find Pratt's depression as a severe impairment at step two is not a reversible error. Pratt also argues that the ALJ erred in failing to consider her asthma to be a severe impairment. In the bold-faced heading of this section of the ALJ's decision, the ALJ listed obesity and arthritis as severe impairments, but in the text immediately below that heading he recognized Pratt's asthma as a severe impairment. (R. 14). The ALJ found that Pratt "presents with complaints of multiple impairments–namely obesity, arthritis, and asthma. After reviewing the evidence, I find the above impairments are severe . . . ." Id. Thus, the ALJ appears to have found that Pratt's asthma was severe. Even if the ALJ did not find that Pratt's asthma was a severe

-11-

the following reasons, the ALJ's decision is not supported by substantial evidence.

### A.     Credibility Determination

Pratt disputes the ALJ's credibility assessment.  "The ALJ's credibility determinations are entitled to special deference but the ALJ is still required to 'build an accurate and logical bridge between the evidence and the result.'"  Castile, 617 F.3d at 929.  ALJs are required to "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it."  Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011).  Further, in evaluating a claimant's credibility, the ALJ must comply with SSR 96-7p and articulate the reasons for the credibility determination.  Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).  SSR 96-7p lists seven factors in addition to the objective medical evidence to be considered in a credibility analysis including the claimant's daily activities, the level of pain or symptoms, aggravating factors, medication, treatment, other measures to relieve pain, and limitations.  SSR 96-7p, at *3.  SSR 96-7p provides that the ALJ's credibility determination must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *4.  The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Id.  It is not sufficient for an ALJ to "make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  Id.

Pratt first objects to the ALJ's use of the boilerplate credibility language described by the Seventh Circuit as "meaningless boilerplate."  Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013).  The ALJ's entire credibility assessment consists of one paragraph, which reads:

---

impairment, any error was harmless because the ALJ proceeded beyond step two of the sequential analysis.  Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012).

Clearly, after careful consideration of the evidence, I find that, while the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the statements made concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment. Despite claimant's complaints of extensive pain and discomfort, I note that, at the hearing, she testified that she had not had physical therapy and that she has not been referred to a pain clinic. Interestingly, however, records in the file indicate that she was referred to an orthopedist at Provident Hospital, but that she has not been to an appointment yet.

(R. 20). The first sentence of the ALJ's credibility determination is essentially boilerplate similar to language which the Seventh Circuit has repeatedly criticized "because it fails to link the conclusory statements made with objective evidence in the record." Moore v. Covlin, - - - F.3d - - - -, 2014 WL 763223, at *2 (7th Cir. Feb. 27, 2014); see also Pepper, 712 F.3d at 367; Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012); Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012) (criticizing this language as "unhelpful"); Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010). Such language "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that the claimant's complaints were not credible." Bjornson, 671 F.3d at 645. The problem with the boilerplate language used in this case is that it "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards." Id. In other words, the use of this boilerplate language "puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." Filus, 694 F.3d at 868. The Seventh Circuit has held, however, that the ALJ's use of this boilerplate language alone is not enough to warrant a reversal or remand "if the ALJ otherwise identifies information that justifies the credibility determination." Moore, 2014 WL 763223, at *2.

Here, the ALJ did not properly justify his adverse credibility determination. The only specific reason provided by the ALJ for rejecting Pratt's statements about the effects of her knee pain is

the nature of the treatment she received. The ALJ recognized that Pratt may "experience some discomfort or even pain," but emphasized the lack of physical therapy and a referral to a pain clinic. (R. 20). A failure to follow a recommended course of treatment can weigh against a claimant's credibility, <u>Craft v. Astrue</u>, 539 F.3d 668, 679 (7th Cir. 2008), but the record does not show that physical therapy or treatment at a pain clinic was prescribed in Pratt's case. The ALJ's implication that Pratt would have been referred to physical therapy or for treatment at a pain clinic if she really had been disabled by pain "impermissibly substitutes the ALJ's personal observations for the considered judgment of medical professionals." <u>Schomas v. Covlin</u>, 732 F.3d 702, 709 (7th Cir. 2013). Under these circumstances, it was improper to discount Pratt's credibility based on the absence of any attempt to seek physical therapy or treatment at a pain clinic. <u>See Burton v. Barnhart</u>, 2006 WL 4045937, at *6 (D. Kan. Nov. 1, 2006) (holding "[i]n the absence of any evidence that physical therapy or treatment at a pain clinic was recommended, or any medical opinion that such treatment would have lessened her limitations or provided pain relief, the ALJ erred by relying on the lack of this treatment when weighing plaintiff's credibility."); <u>Mazza v. Barnhart</u>, 2006 WL 4045936, at *9 (D. Kan. Oct. 25, 2006) (same).

Further, as to the nature of Pratt's treatment, the record establishes that Pratt was referred to an orthopedic specialist for likely steroid injections and recommended for lap-band surgery to help her conditions. (R. 66, 72, 79-80, 547, 662). Pratt testified that she was seeing an orthopedic surgeon two days after the administrative hearing. (R. 68). These recommendations belie the ALJ's suggestion that the nature and level of Pratt's treatment is inconsistent with her allegations of disabling pain.

The Commissioner contends that the ALJ also reasonably discounted Pratt's credibility based on her daily activities. Pratt argues that the ALJ exaggerated the extent of her daily activities. "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96-7p, at *3, this must be done with care." <u>Roddy v. Astrue</u>, 705

F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has "repeatedly emphasized that an ALJ is supposed to consider a claimant's limitations in performing household activities . . . and cautioned 'that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time.'" Schreiber v. Colvin, 519 Fed.Appx. 951, at *9 (7th Cir. March 27, 2013) (quoting Roddy, 705 F.3d at 639); see also Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009) (holding "[a]n ALJ cannot disregard a claimant's limitations in performing household activities.").

At step two, the ALJ determined that Pratt's activities of daily living were only mildly limited. (R. 15). The ALJ made only passing reference to Pratt's daily activities in his decision, noting that Pratt does a "little cooking, cleaning, and laundry," "some cooking and some shopping," and "does cook, clean and do laundry." (R. 15, 16, 18). The ALJ ignored the fact that Pratt's cooking is limited to heating up frozen meals and Pratt requires assistance with laundry, shopping, and cleaning from her sister. At the administrative hearing, Pratt described very limited daily activities, noting she "lay[s] around" and "sleep[s] all day." (R. 54, 55). Pratt testified that she spends about 15 hours a day in bed. (R. 57). Her cooking consists of using the microwave or cooking frozen entrees in the oven. (R. 57-59). Pratt's activities are limited to watching television and reading. (R. 57). Pratt does not shop or do laundry. (R. 59, 61). Pratt's sister (Tracy Pratt) does the grocery shopping and laundry for Pratt. Id. Pratt testified that her sister helps her every day. (R. 85). Pratt stated: "My sister does everything for me. She's like my angel. She go[es] grocery shopping for me. She clean[s] my house. She washes my dishes. She takes care of me. She cooks for me." (R. 85). Given her limited cooking and her sister's help with laundry, shopping, and cleaning, Pratt's testimony that she does not do much of anything is not inconsistent with her claim that she suffers from disabling back and knee pain. Because an ALJ is supposed to consider a claimant's limitations in performing household activities, the ALJ erred in failing to acknowledge Pratt's cooking limitations and dependence on her sister for shopping, cleaning, and laundry.

The Commissioner argues that the ALJ accurately noted that Pratt's statements that she did "a little cooking, cleaning and laundry" or "some cooking and some shopping" were at odds with her statement that she did not do much of anything. (Doc. 22 at 6). But the evidence the ALJ cites–Dr. De Biase's April 3, 2010 consultative examination report–does not contradict Pratt's statement that she did not do much of anything. (R. 15,18). The ALJ's characterization of what Pratt told Dr. De Biase regarding her daily activities is inaccurate and misleading. For example, despite the ALJ's representation that Pratt can do laundry (R. 15 and 18), the report from Dr. De Biase does not state Pratt does laundry. (R. 490) (stating "laundry is done by her son or her sister."). Dr. De Biase's report in fact supports Pratt's testimony that she cooks meals in a microwave and she receives substantial assistance with her daily activities from her sister. Pratt told Dr. De Biase that "[c]ooking, cleaning and laundry is done by her son or her sister who help her at home. She states that she can do a little of the cooking and cleaning. She will do it just for a little bit while sitting down and using the microwave oven." (R. 490). The ALJ fails to disclose theses qualifications and limitations mentioned by Pratt regarding her household activities.

Further, the ALJ overstated the significance of Pratt's statement to Dr. Friedson on April 3,2010 that she does "some cooking and also does some shopping." (R. 16, 438). Again, Pratt testified that her cooking was limited to using the microwave or heating frozen food in the oven. (R. 57-59). As to shopping, Pratt testified that her sister does the grocery shopping. (R. 59). Pratt testified to once going grocery shopping with her sister, but she could only walk for a half-hour to an hour and then needed to sit after walking due to back pain. (R. 59-60). The ALJ failed to discuss other statements to Dr. Friedson indicating that Pratt has substantial family support. (R. 438). In sum, the ALJ erred in failing to take into account Pratt's limitations in performing household activities and did not explain how her minimal activities contradict the pain and limitations she claims.

Also troubling is the ALJ's failure to address the statements of Pratt's sister Tracy Pratt regarding the Pratt's pain and daily activities. The ALJ must consider the entire record, including statements by "other persons about the symptoms and how they affect the individual." SSR 96-7p. Although the ALJ need not discuss every piece of evidence, the Court must be able to discern the ALJ's reasoning or provide a logical bridge between the evidence and his conclusions. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ "need not evaluate in writing every piece of testimony" as long as the Court can "trace the path of the ALJ's reasoning."). Tracy Pratt stated that Pratt cries because "her legs [are] aching so bad." (R. 223). With regard to Pratt's activities, Tracy Pratt wrote "[b]ecause of her condition she can't stand to do anything, pain in legs, aching and hard time breathing prevents an[y] type of work." (R. 225). Tracy Pratt explained that Pratt performs "no chores." Id. Tracy Pratt helps Pratt with cleaning, laundry, and ironing. Id. Tracy Pratt also stated that Pratt prepares her food by putting frozen dinners in the microwave. Id.

The ALJ did not acknowledge or discuss Tracy Pratt's written statements about Pratt. The ALJ's opinion states generally that he carefully considered the "entire record" and "all the evidence" (R. 12, 14, 17). The Commissioner does not dispute that the ALJ failed to discuss Tracy Pratt's notes, but argues Tracy Pratt's observations were redundant of Pratt's own assertions about the extent of her limitations. An ALJ need not specifically address a lay witness statement when it is "essentially redundant" of other evidence in the record which the ALJ has otherwise addressed. Herron v. Shalala, 19 F.3d 329, 337 (7th Cir. 1994) (holding that "the ALJ did not err in failing to mention reasons for rejecting [plaintiff's wife's] testimony" because "the ALJ addressed the issues raised by [her] in relation to [plaintiff's] testimony); Carlson, 999 F.2d at 181 (holding ALJ was not required to discuss wife's testimony that "essentially corroborated [the plaintiff's] account of his pain and daily activities" where the ALJ explicitly addressed the plaintiff's testimony concerning his pain and daily activities and thus the wife's testimony "was essentially redundant."). The

Commissioner's redundancy argument fails here because the ALJ failed to properly account for Pratt's significant limitations in performing daily activities. There is no discussion in the ALJ's decision concerning Pratt's account of her meal preparation as consisting only of heating up frozen dinners and the significant assistance provided by her sister with housework and shopping. This evidence, as corroborated by Tracy Pratt's statement, is relevant to a consideration of the intensity, persistence, and limiting effects of Pratt's symptoms. The ALJ may not ignore this entire line of pertinent evidence. <u>Carlson</u>, 999 F.3d at 181 (stating "[if] the ALJ were to ignore an entire line of evidence, that would fall below the minimum level of articulation required.").

The Commissioner contends that the ALJ reasonably concluded that Pratt's complaints of extensive pain and discomfort were contradicted by the objective medical evidence, even when taking into account her morbid obesity. (Doc. 22 at 6). While the lack of objective support from physical examinations and test results is relevant, "an ALJ may not base a decision solely on a lack of objective corroboration of complaints of pain." <u>Pierce v. Colvin</u>, 739 F.3d 1046, 1049 (7th Cir. 2014). The ALJ offered no other support for his adverse credibility finding. Without any discussion of the other factors required by SSR 96-7p, the ALJ failed to build a logical bridge between the evidence and his conclusion that Pratt was not credible. Because the ALJ's credibility assessment lacks the minimum requirements for specificity and support, it must be reconsidered on remand. On remand, the ALJ shall explain the reasons and evidence that form the basis of any credibility determination as required by SSR 96-7p and consider the limitations to Pratt's daily activities in the credibility assessment.

### B.    Treating Physician's Opinion

Pratt also argues that the ALJ inadequately evaluated Dr. Chukwudozie Ezeokoli's opinion that Pratt is unable to work. A treating physician's opinion is entitled to controlling weight if it is supported by objective medical evidence and is consistent with other substantial evidence in the record. 20 C.F.R. 416.927(c)(2). "Obviously if [the treating physician's medical opinion] is well

supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradictory evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006). At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." Id. at 377.

If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 416.927(c)(1)-(6). This "checklist is designed to help the administrative law judge decide how much weight to give the treating physician's evidence. When he has decided how much actual weight to give it, there seems no room for him to attach a presumptive weight to it." Hofslien, 439 F.3d at 377. Finally, a claimant is not disabled simply because his treating physician says so. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001); 20 C.F.R. § 416.927(e)(1). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." Dixon, 270 F.3d at 1177 (quoting Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985)).

On September 28, 2010, Dr. Ezeokoli, Pratt's treating physician since April 12, 2010, indicated that Pratt suffers from asthma, osteoarthritis of both knees, high blood pressure, and is overweight. (R. 541). Dr. Ezeokoli explained that Pratt's symptoms include shortness of breath on exertion, bilateral knee pain when walking, wheezing, knee swelling and tenderness. Id. Dr. Ezeokoli stated that Pratt has sharp, constant pain in both knees that he rated as a 7-9 on a scale of 10. Id. Dr. Ezeokoli noted that Pratt's knee pain was not relieved by medication and that she

has limited ambulation.  Id.  When the form asked Dr. Ezeokoli to identify the clinical findings which supported his assessment, Dr. Ezeokoli wrote: "shortness of breath, knee swelling and tenderness, wheezing."  Id.  Dr. Ezeokoli stated that Pratt's knee pain has been treated with pain medication, physical therapy, and at a pain clinic, but no records of physical therapy or pain clinic treatment exist in the record.  Id.  Dr. Ezeokoli explained that Pratt's asthma had been treated with steroids and Albuterol.  Id.  Dr. Ezeokoli opined that Pratt: (1) was experiencing pain severe enough to "constantly" interfere with attention and concentration needed to perform even simple work tasks; (2) could walk 1-2 blocks without rest or severe pain; (3) could sit 45 minutes at one time before needing to get up; (4) could stand 20 minutes at one time; (5) could stand/walk less than two hours in an eight-hour workday; (6) could sit about two hours in an eight-hour workday; (7) would need unscheduled breaks every 20-45 minutes during an eight-hour workday; (8) must use a cane or other assistive device when engaging in occasional standing/walking; (9) can occasionally lift and carry less than ten pounds; (10) can rarely lift and carry ten pounds; (11) can rarely twist, stoop (bend), or climb stairs; (12) can never crouch/squat or climb ladders; and (13) would likely be absent from work about four days per month as a result of her impairments or treatment.  (R. 542-44).  Dr. Ezeokoli concluded that Pratt is incapable of even a "low stress" job because she is in "constant pain."  (R. 542).  When the VE considered the limitations set forth by Dr. Ezeokoli, he opined that such physical limitations precluded all work.  (R. 93).

The ALJ rejected Dr. Ezeokoli's opinion that Pratt is unable to work.  (R. 19).  Because controlling weight was not given to the opinion of Dr. Ezeokoli, the Court looks to whether the ALJ adequately articulated the reasoning for rejecting his opinion.  The ALJ gave several adequate reasons for rejecting Dr. Ezeokoli's opinion regarding the extent of Pratt's knee pain, which he described as constant and rated as 7-9 out of 10.  The ALJ first noted that Dr. Ezeokoli's statement that he had seen Pratt for 6 months, every 2 months was inconsistent with the treatment records showing that they met just twice prior to September 28, 2010, only on April 12, 2010 and

September 15, 2010 for food allergy follow-up appointments. (R. 19). The length, nature, and frequency of the treatment relationship is relevant to evaluating how much weight to accord a treating physician's opinions. 20 C.F.R. § 416.927(c)(2)(i) (ii). Next, the ALJ rejected Dr. Ezeokoli's opinion of disabling pain as conflicting with the fact that Dr. Ezeokoli prescribed no pain medication for Pratt's knee pain on April 12, 2010 and September 15, 2010. (R. 19). The lack of prescription medication is inconsistent with a finding of disabling pain. Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994) (noting claimant's complaints of pain "inconsistent with his minimal reliance on pain medication."). The ALJ also rejected Dr. Ezeokoli's opinion that Pratt was suffering pain from a level of 7 to 9 out of 10 that would not subside with pain medication, treatment at a pain clinic, or physical therapy because he never prescribed Pratt any pain medication, never referred her to a pain clinic, and never suggested physical therapy. (R. 541). The ALJ further observed that Dr. Ezeokoli's opinion was contradicted by subsequent treatment notes from June 29, 2011, stating that Pratt had been experiencing knee pain for seven days, had no prior episodes, and examination revealed minimal knee pain and normal musculoskeletal findings other than right knee tenderness but showed that ankles/feet are neurovascularly intact with no joint laxity. (R. 20, 635, 637).

The ALJ adequately articulated why he declined to give Dr. Ezeokoli's opinion controlling weight. The problem here is that once the ALJ rejected Dr. Ezeokoli's opinion, he was left with a decision that does not support the RFC determination. The Commissioner contends that the ALJ based his analysis of Pratt's RFC on the opinion from Dr. Panepinto, the state agency reviewing physician. The Commissioner argues that "a commonsensical reading of [the ALJ's] decision makes it absolutely clear that he accepted the opinion in its entirety and give it full weight, since his RFC determination tracks the language of Dr. Panepinto's opinion almost word-for-word." (Doc. 22 at n.2). The Commissioner's argument is an impermissible post hoc rationale. The ALJ's findings regarding Pratt's ability to perform work-related physical activities do mirror Dr. Panepinto's assessments, but nowhere in the decision does the ALJ mention the state agency physician's

opinion and there is no indication that he relied on it. "'What matters are the reasons articulated *by the ALJ*,' not the rationale advanced by the Commissioner on appeal." Meuller v. Astrue, 493 Fed.Appx. 772, 776 (7th Cir. 2012) (emphasis in original). Dr. Panepinto's opinion cannot support the ALJ's RFC determination. On remand, the ALJ must fill this evidentiary gap regarding Pratt's RFC created by rejecting Dr. Ezeokoli's opinion. See Suide v. Astrue, 371 Fed.Appx. 684, 690 (7th Cir. April 6, 2010) (remanding where the ALJ's rejection of treating physician's opinion created an evidentiary deficit and left the ALJ's RFC determination without supporting medical evidence).

### C. Obesity

Pratt next contends that when assessing her RFC and pain, the ALJ failed to adequately consider the impact of her obesity on her arthritic knees and the likely role it played in her fatigue and mobility problems. "[W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. Pt.404, Subpt. P, App.1 § 1.00(Q). An "ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009); see also Martinez, 630 F.3d at 698 (stating "[i]t is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index of 40.").

Pratt is extremely obese. SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002) (stating that "BMIs greater than or equal to 40" are level III or extreme). In his step two discussion, the ALJ noted that on April 12, 2010, Pratt weighed 377 pounds, with a BMI of 55.7. (R. 16). On July 20, 2011, eight days after the administrative hearing, Pratt weighed 402 pounds and she is 5'9" tall (R. 661, 664). The ALJ found Pratt's obesity to be a severe impairment at step two but concluded at step three that Pratt's impairments, alone or in combination with her other impairments, did not

meet a listed impairment.  (R. 14, 17).  At step three, the ALJ noted that there is no listing for obesity but stated that he had considered the cumulative effects of Pratt's obesity in finding that her impairments are not listing-level.  (R. 17).  The ALJ stated in cursory fashion at step three that "[a]s to the claimaint's allegations of arthritis and hypertension, the undersigned considered the criteria enunciated in Sections 1.00 and 4.00(H) and determined that, even despite the presence of obesity, the medical records do not demonstrate any chronic effects of arthritis, or any significant effects of hypertension in reference to any specific body system.  Relative to claimant's history of asthma, again, even considering her obesity and hypertension, the medical evidence reflects an asthma condition that has generally remained well-controlled throughout the years, even since childhood.  (R. 17).

In his RFC assessment, the ALJ used the exact same language from his step three finding above.  (R. 18).  Then, in summarizing the records from Pratt's emergency room visit on June 29, 2011, the ALJ noted that Pratt was described as morbidly obese and "she reported exacerbating factors consisting of movement and weight-bearing walking."  (R. 19).  The ALJ noted that on examination, Pratt had normal range of motion, normal strength, was neurovascularly intact in the lower extremities, and there was no joint laxity.  Id.  The ALJ further noted that x-rays of Pratt's knees did reveal some medial joint space narrowing of the left knee, but there was no gross joint effusion bilaterally, no evidence of any fracture or dislocation, and no focal bone erosion bilaterally. Id.  The ALJ mentioned that Dr. Ezeokoli diagnosed Pratt as obese.  Id.  Finally, the ALJ noted that Pratt contends that she is disabled mainly due to arthritis of the knees exacerbated by her obesity. (R. 20).  The ALJ made no further mention of Pratt's extreme obesity.

Although the ALJ referenced Pratt's obesity on several occasions throughout his decision in relation to her osteoarthritis, hypertension, and asthma and the objective medical findings, he offered no analysis of the effects of obesity on Pratt's subjective complaints of pain and whether her pain was exacerbated by her obesity.  Pratt's complaints include back pain, knee pain, and

ankle swelling. The ALJ did not specifically discuss how Pratt's extreme obesity factored into his assessment of her credibility. Hurley v. Colvin, 2014 WL 939441, at *13 (N.D. Ind. 2014) (finding reversible error where the ALJ did not consider whether the plaintiff's "obesity caused him to be in greater pain tha[n] he would have been had he not been obese or how the postural limitations he testified to (sitting no more than 30 minutes and then needing to lie down) were impacted by his obesity."). On remand, the ALJ shall discuss how Pratt's extreme obesity interacts with her pain in the context of the credibility determination. Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004) (finding "[e]ven if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both."); SSR 02-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002) (stating "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.").

The Commissioner suggests that the ALJ indirectly accounted for Pratt's obesity by relying on the most recent medical opinion of Dr. Panepinto, the state agency physician, who evaluated her height and weight. The failure to consider the effects of obesity may be harmless error when the ALJ relies on medical opinions by doctors who were aware of the claimant's obese condition. Prochaska v. Barnhart, 454 F.3d 731, 736-37 (7th Cir. 2006) (holding an ALJ's failure to explicitly address the effects of obesity may be harmless error if the ALJ "specifically predicated his decision upon the opinions of physicians who did discuss her weight."); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004). Because the ALJ here did not mention, let alone rely on, Dr. Panepinto's opinion, the Commissioner's harmless error argument fails.

Because the ALJ will be reassessing the effects of obesity on Pratt's complaints of pain, the ALJ shall also consider upon remand Pratt's extreme obesity in relation to her depression and fatigue, both of which can be impacted by obesity. "Obesity may also cause or contribute to mental impairments such as depression." SSR 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002) (stating

"[t]he effects of obesity may be subtle, such as the loss mental clarity and slowed reactions that may result from obesity-related sleep apnea."). The ALJ shall further consider the effect of Pratt's obesity on her difficulty sleeping and whether a consultative examination is warranted to evaluate possible sleep apnea. Pratt has complained about symptoms indicating possible sleep apnea. For example, at the hearing, Pratt testified that she had never had a sleep study but she feels like she is "going to die in her sleep." (R. 79). She stated "my breathing sometimes I feel like I can't catch my breath and I wake up, I jump up." Id; see also (R. 55) (Pratt testified she goes to bed at 10 p.m. and wakes up at 11:00 a.m. and "wake[s] up all between, all through the hours."); (R. 438) (Pratt reported "she does have difficulty sleeping through the night."). Pratt's sister confirmed that Pratt's condition affects her sleep, stating Pratt "jumps up out of her sleep gasping for air and in pain." (R. 224).

### III. CONCLUSION

For the reasons and to the extent stated herein, Plaintiff's Motion for Summary Judgment [19] is granted and the Commissioner's Motion for Summary Judgment [21] is denied. The decision of the Commissioner is reversed and this case is remanded for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff Mary L. Pratt and against the Defendant Acting Commissioner of Social Security.

E N T E R :

_____
Daniel G. Martin
United States Magistrate Judge

Dated: April 16, 2014